**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RICO I. HAIRSTON,**

      **Plaintiff,**

      **v.**                            **Civil Action 2:18-cv-378**
                                        **Magistrate Judge Jolson**

**MRS. MARIA, et al.,**

      **Defendants.**

## OPINION AND ORDER

Plaintiff commenced this action on April 24, 2018, and he has submitted approximately twenty filings in the three months that followed. The Court addresses a number of Plaintiff's filings below.

### I.    BACKGROUND

Plaintiff is an inmate housed at the Correctional Reception Center ("CRC") proceeding *pro se* against the following Defendants: Lieutenant Tyler, Lieutenant Shasteen, Correctional Officers Eyre, Grimm, and Hitch, Nurse Maria, Mental Health Supervisor Mr. Brown, and Sergeant John Doe. (*See generally* Doc. 8). Plaintiff's complaint raises a number of different (perhaps unrelated) claims and is difficult to follow, particularly with respect to the timing of the alleged incidents.

The first incident appears to have occurred on February 28, 2018, when Plaintiff alleges that he was placed in "the hole under investigation for undisclosed reasons." (*Id*. at 9). He asserts that, on that day, correctional officers informed other inmates of his location, so they could subject him to verbal harassment because he was convicted of a sex crime. (*Id*. at 9). Plaintiff alleges that "for 3 days[,] inmates on this unit [were] yelling out their doors calling [him] a 'f***ing chomo' 'baby

rapist' 'toucher'" and telling him he was going to be "touched" and that his sister or daughter would be raped. (*Id*. at 9). Plaintiff also claims that the inmates threatened to hack his J-Pay account and "harass [his] family and let [him] know they are going to have [him] 'touched' by sending out an S.O.S. (stab on sight) to every prison in Ohio." (*Id*. at 10).

Plaintiff later alleges that he received a ticket on March 5, 2018, and went before the Serious Misconduct Panel on March 12, 2018, which resulted in him being housed continuously in "the hole." (*Id*. at 12). He asserts that Lieutenant Tyler told him to "get comfortable," because he would be in the hole for years. (*Id*.).

At some point, Plaintiff requested to be on suicide watch and submitted informal complaints asking to be separated from the harassing inmates. (*Id*. at 10). Plaintiff's cell location was changed first to cell 2112, and then to cell 2104. (*Id*.). Plaintiff states that cell 2104 had no working sink, but his complaints about it were disregarded. (*Id*.). Plaintiff contends that he continued to be harassed in this location, with fellow inmates telling him "your sister sent us stamps on J-Pay and pictures, we told her we was in here for murder and that we was going to get you touched. I told that b***h to send us pictures then I cussed that b***h out." (*Id*.). Plaintiff again requested to be placed on suicide watch, filed an informal complaint, and asked that he be separated from the harassing inmates. (*Id*. at 11).

Plaintiff alleges that, on March 20, 2018 at approximately 2:30 p.m., he was placed in cell 1210, which "was covered in black mold, feces, urine, and asbestos" on "the sink walls, and the entire ceiling." (*Id*. at 3; *see also id*. at 11). Plaintiff contends that he complained to the prison staff, including Defendants, but they took no action in response. (*Id*. at 3).

Beginning at approximately 9:00 p.m., Plaintiff threatened repeatedly that, if he was not removed from the cell, he was going to take his own life. (*Id*.). Plaintiff alleges that the prison staff

2

ignored his pleas.  (*Id.*).  More specifically, Plaintiff avers:

> I tell Correctional Officer Mr. Grimm "I'm going to kill myself."  He says, "okay,"
> then walks away.  He never reports this to anyone nor does he contact medical, or
> his supervisor.
>
> Time goes by, I'd say about an hour and fifteen minutes by this time it's 3rd shift;
> about 10:15 p.m. and Correctional Officer Mr. Hitch comes past my cell, and as he
> approaches my cell, I tell him, "Look, I'm going to kill myself, take me out of this
> cell."  I ask him did 2nd shift tell him, and he says "No."  He then says, "Okay, hold
> on," and leaves to report this to Nurse Maria.
>
> Nurse Maria approached my cell, and as I begin to tell her I'm going to commit
> suicide … she cuts me off and states, "I don't give a shit, go ahead and do it, they
> come thru every 20 minutes, your [sic] on a suicide floor, we'll deal with it when it
> happens."  Then she walks away, comes back about one minute later and says
> something else but I start to yell for the Correctional Officer Mr. Hitch and scream[ ]
> for help.

(*Id*. at 3–4).

Plaintiff then describes the actions he took in an effort to take his own life.  (*Id*. at 4).  He

alleges:

> I then put toilet paper on my window and start planning a way to hang myself with
> my towel.  Correctional Officer Mr. Hitch walks up to my cell door, starts to bang
> on the door and then pops the food trap slot open.  He then states, "This is the easiest
> way to get sprayed, just wait until a 'white shirt' walks around."
>
> I then proceed to rip my towel, start making a nosse [sic], rig it in the vent above the
> door and hang myself!

(*Id*.).

Plaintiff does not explain how he survived, but he reiterates that the prison staff ignored

him:

> The Correctional Officer Mr. Hitch walked past my cell door every 30 minutes and
> just looks at me and keeps walking as I'm hanging, choking to death.  I had ripped
> my towel, made a nosse [sic] and was attempting to "go ahead and do it" as Nurse
> Maria advised me, and Correctional Officer Mr. Hitch just kept walking past my cell
> door with deliberate indifference, dereliction of duty, and malice.

(*Id*.).  Based on these facts, Plaintiff alleges that Defendants were deliberately indifferent to his

serious medical needs.  (*Id*.).

Plaintiff asserts that he filed an informal complaint on March 23, 2018, but it was not resolved to his satisfaction.  (*Id*. at 5).  Plaintiff then filed a grievance reasserting the same facts and requesting that prison officials check the audio recording.  (*Id*.).  This grievance likewise was not resolved to Plaintiff's satisfaction, prompting him to file this lawsuit on April 24, 2018.  (*Id*.).

Plaintiff completed health services requests before he filed suit, on March 24 and 26, 2018, complaining of dizzy spells, migraines, and coughing up blood.  (*Id*.).  Plaintiff was examined on March 27, 2018, but he nonetheless maintains that Defendants demonstrated deliberate indifference to his medical needs and that he was subjected to unsafe conditions.  (*Id*.).

Plaintiff also complains that he was denied the right to make a legal call at the beginning of April 2018.  (*Id*. at 11).  He alleges that, on April 4, 2018, he received a false conduct report from Lieutenant Tyler "where he lies and says I called him a 'b***h ni**a' and told him 'I was going to spit in his face' and that 'the flood gates are open.'"  (*Id*.).  Plaintiff had a Rules Infraction Board hearing the same day.  (*Id.*).

Plaintiff states that, during the hearing, he denied making the statements and called a fellow inmate as a witness.  (*Id*.).  He also claims that Lieutenant Tyler snuck into the RIB room, despite regulations stating that he should not be included in deliberations.  (*Id*. at 5, 13).  Plaintiff continues:

> [w]hen I was called back into the RIB room, Lieutenant Shasteen states, "because you didn't allow Lieutenant Tyler to be present, we are going to have to find you guilty. . . ."  I then ask him, "did Lieutenant Tyler just come in here?"  He says . . . "well . . . yeah . . . , theres two cameras right there . . . one, two, this is his office, I can't stop him from coming in here.

(*Id*. at 5) (alterations in original).  Plaintiff claims that he was improperly given a 30-day phone and J-Pay restriction, his mail is not being sent out, and he is being denied legal assistance because Lieutenant Tyler seeks to "cut all [his] communication off from the outside world. . . ."  (*Id*. at 12).

Based upon all of those allegations, Plaintiff sets forth the following as his legal claims:

> The harassment, retaliation, deliberate indifference, discrimination, racial slurs, denial of access to the court, [and] due process violations, constituted cruel and unusual punishment and violated Plaintiff['s] 1ˢᵗ Amendment, 8ᵗʰ Amendment, and 14ᵗʰ Amendment rights to the … United States Constitution.

(*Id*. at 13).

## II.  PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION AND TEMPORARY RESTRAINING ORDER (Doc. 13)

On May 17, 2018, Plaintiff filed a Motion for Permanent Injunction and Temporary Restraining Order.  (Doc. 13).  Plaintiff claims that he is being "discriminated against by multiple staff members," who are telling inmates that Plaintiff is a "chomo."  (*Id*. at 1).  The remainder of Plaintiff's Motion appears to pertain to his J-Pay account.  In particular, Plaintiff claims that he has been denied copies of his J-Pay materials, including internal grievances, complaints, and appeals.  (*Id*.).  He also alleges that an inmate hacked his account on May 13, 2018, exhausting all of his 216 stamps worth $36.50, and transferring $72.10 from his trust fund account to his media account.  (*Id*. at 1–2).

Plaintiff alleges that he reported the hacking to prison officials, who responded that there was nothing that they could do about it because J-Pay does not issue refunds.  (*Id*. at 3).  According to Plaintiff, "[t]his is an act of robbery and fraud; our trust fund accounts are accessible by other inmates and staff are allowing it, taking no measures to prevent this or secure our funds."  (*Id*.).

Finally, Plaintiff alleges that his life was threatened by prison staff.  (*Id*. at 4).  He states, "I am trapped in the hole, I've been robbed, showed indifference, discriminated against, given no redress. . . ."  (*Id*.).  Plaintiff explains that he is "respectfully asking for a permanent injunction to retrieve all funds stolen out of my account and a temporary restraining order from all named defendants and all staff who take orders from the Warden Mrs. Smith."  (*Id*. at 4).  Plaintiff

concludes that he has "committed no violations," but is still improperly "being held in the hole." (*Id.*).

Defendants filed a response on July 5, 2018, arguing that: (1) Plaintiff has not established a strong likelihood of success on the merits (Doc. 24 at 3–5); Plaintiff will not suffer irreparable harm if an injunction is denied (*id*. at 5); granting Plaintiff's relief would cause substantial harm to penological interests (*id*. at 6); and the public interest would not be served by granting the relief (*id*.).

### A.      *Legal Standard*

The factors to be weighed before issuing a temporary restraining order are the same as those considered for issuing a preliminary injunction.  *See, e.g.*, *Workman v. Bredesen*, 486 F.3d 896, 904–05 (6th Cir. 2007).  More specifically, the Court considers the following:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (citation and internal quotation marks omitted).  These are "factors to be balanced, not prerequisites that must be met." *Welch v. Brown*, 551 F. App'x 804, 808 (6th Cir. 2014) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)).  "'While as a general matter, none of these four factors are given controlling weight, a preliminary injunction where there is simply no likelihood of success on the merits must be reversed.'"  *Farnsworth v. Nationstar Mortg., LLC*, 569 F. App'x 421, 425 (6th Cir. 2014) (quoting *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (noting that "a finding that there is simply no likelihood of success on the merits is usually fatal").

Additionally, "'[t]he party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success.'" *Ky. v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014); *see also Overstreet v. Lexington–Layette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (stating that injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it"). Further, the "proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

Finally, the Prison Litigation Reform Act imposes certain limitations on the granting of prospective relief "in any civil action with respect to prison conditions." 18 U.S.C. 3626(a)(1). That is, such relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." *Id.*

### B.    Analysis

The gravamen of Plaintiff's Motion appears to relate to the alleged robbery or fraud concerning Plaintiff's J-Pay account. Plaintiff must demonstrate more than a mere possibility of success concerning this claim. *Doe v. The Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016). Defendants argue that Plaintiff has failed to demonstrate that post-deprivation tort remedies available to him under Ohio law are inadequate to adjudicate his property loss claims. (Doc. 24 at 4) (citing *Martin v. Wilson*, No. 2:18-cv-463, 2018 WL 2215917, at *3 (S.D. Ohio May 15, 2018)). Hence, this Court agrees that Plaintiff has not demonstrated a strong likelihood of success on the merits of his claim.

Turning to the second factor, Defendants argue that Plaintiff cannot demonstrate irreparable harm because he does not claim ongoing access to his J-Pay accounts by other inmates.

(*Id*. at 5). Plaintiff attempted to remedy this issue by filing a "Motion to Amend his Temporary Restraining Order Adding New Constitutional Violation of Irreparable Injury." (Doc. 37). However, this document changes the basis for his original Motion entirely and appears to allege harm stemming from harassment based on his conviction for rape, including his placement in segregation. (*Id*.). Indeed, Plaintiff concedes that J-Pay reviewed his account and issued him a refund. (*Id*.). Thus, Plaintiff is unable to demonstrate he would suffer irreparable injury without the injunction. Alternatively, Plaintiff fares no better pursuing injunctive relief based upon his placement in administrative segregation because the due process clause does not "create a liberty interest to be free from administrative segregation." *McCullough v. Fed. Bureau of Prisons*, No. 1:06-cv-563, 2010 WL 5136133, at *5 (E.D. Cal. Dec. 6, 2010) (stating that "[a]dministrative segregation is the type of confinement that should be reasonably anticipated by inmates at some point in their incarceration"). For these reasons, Plaintiff's Motion for Permanent Injunction and Temporary Restraining Order (Doc. 13) and Plaintiff's Motion to Amend his Temporary Restraining Order Adding New Constitutional Violation of Irreparable Injury (Doc. 37) are **DENIED**.

### III. PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINTS (Doc. 16)

On July 11, 2016, Plaintiff filed a Motion for Leave to File "2 Supplemental Complaints" adding new Defendants Mrs. Smith, Mr. Marchand, Mr. Hettinger, and "new events." (Doc. 16). In the Motion, Plaintiff claims that Mrs. Smith improperly instructed the Serious Misconduct Panel ("SMP") to "re-open a case they closed based on no physical evidence . . . ." (*Id*. at 1). Plaintiff states:

> I was denied an appeal, until the SMP panel re-heard the case and then recommended extended restrictive housing (ERH) where I was told I will be back in the hole for 1 year or longer, but I have not been sentenced to any specific amount of time. This

is a violation of my 14th Amendment rights against cruel and unusual punishments, which I am currently faced with as I have been in the house 98 days as of today, June 5, 2018.

(*Id*. at 1–2).

Plaintiff explains that his "additional complaint" against Mr. Marchand and Mr. Hettinger is based on the following:

while out of my cell in a mental health programming class, Mr. Marchand (out of malice) placed my food tray on the ground in a corner with the lid slightly off and about "100" ants attacked my food! When I slid the tray out of my cell, told him he put my tray on the ground and there was ants in my food, he said, "Now I'm going to make sure you get a nice breakfast, lunch, and dinner!" laughed and walked away.

(*Id*. at 2). Plaintiff also alleges that Mr. Marchand denied him a free envelope for a legal matter, unnecessarily wrote a "ticket" on him, and instructed Mr. Hettinger to find him guilty and take away his J-Pay, phone, and commissary. (*Id*.).

In an Opposition to Plaintiff's Motion, Defendants argue that leave should be denied because "the claims contained in the supplemental complaint and the defendants named in the said complaint are not sufficiently related to Plaintiff's original complaint." (Doc. 27 at 2). Defendants explain:

In our case, Plaintiff's original complaint contains allegations of wrongdoing surrounding his placement in the Transitional Program Unit ("TPU"). These allegations included inmate access to his inmate trust account, disclosure of the criminal offense for which Plaintiff was incarcerated, being placed in the TPU for undisclosed reasons and being held there unlawfully, being denied access to the courts and inadequate cell conditions. ECF No.8, at 8–15. In his original complaint, Plaintiff also alleged wrongdoing by other Ohio Department of Rehabilitation and Correction ("ODRC") defendants who were assigned to the Crisis Stabilization Unit ("CSU"), informally known as "D-1." These allegations included deliberate indifference to his serious medical needs (failing to respond to his suicide threats) and substandard cell conditions.

Plaintiff's proposed tendered complaint is not properly related to the above allegations contained in his original complaint. Plaintiff's new claims relate to a lunch tray which was allegedly placed on his cell floor, allowing ants access to his tray. He also claims that Defendant Marchland wrote a false conduct report that

stated Plaintiff threw his lunch tray across the unit floor. He also sues Defendant Hettinger, alleging that Hettinger improperly oversaw the conduct report proceedings related to Marchland's report.

These new allegations do not relate to the allegations contained in the original complaint. In addition, the two proposed defendants are not defendants in the original complaint.

(*Id*. at 4). This Court agrees that Plaintiff's proposed supplemental complaints appear to have little or no relation to the claims raised in the original complaint. *See, e.g.*, *Dyess v. Mullins*, No. 1:16-cv-910, 2017 WL 2828642, at *3 (S.D. Ohio Sept. 1, 2017) (denying Plaintiff's motion to amend to add claims relating to an entirely separate incident and involving three new Defendants). Consequently, his Motion for Leave is **DENIED**. (Doc. 16). To the extent that Plaintiff has requested that this Court issue summons and that the proposed supplemental complaints be served, those Motions are likewise **DENIED** for the same reason. (Docs. 20, 39).

## IV. PLAINTIFF'S MOTION FOR ASSISTANCE IN OBTAINING AFFIDAVIT OF MERIT FOR MEDICAL CLAIM AND MOTION FOR INJUNCTION TO OBTAIN THIS AFFIDAVIT AND RECORDS (Doc. 17)

On June 11, 2018, Plaintiff filed a "Motion for Assistance in Obtaining Affidavit of Merit for Medical Liability Claim; Motion for Injunction to Obtain Affidavit and Records." (Doc. 17). In this Motion, Plaintiff sets forth his efforts to obtain counsel, his need for an affidavit from a physician, and his need for certain evidence in support of his claim. (*Id*. at 1–2). Defendants oppose Plaintiff's Motion, arguing that Plaintiff is improperly seeking the appointment of an expert witness and fails to state a claim of medical deliberate indifference upon which relief can be granted. (*Id*. at 3–4). Defendants likewise argue that Plaintiff improperly filed a Motion rather than seeking the evidence mentioned through discovery. (*Id*. at 4–5). Plaintiff filed what appears to be a Reply Brief but is captioned as a Motion. (Doc. 40).

Upon review, the Court finds Plaintiff's "Motion for Assistance in Obtaining Affidavit of

Merit for Medical Liability Claim; Motion for Injunction to Obtain Affidavit and Records" to be premature. In a case such as this, the issue is not whether Defendants are guilty of medical malpractice. Rather, the issue is whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. As the Sixth Circuit has explained, "[t]he issue of calculatedly ignoring the medical needs of a prisoner are not so complicated and difficult that an expert is required to present or prove the case." *Friend v. Rees*, 779 F.2d 50 (6th Cir. 1985). Further, Plaintiff appears to seek to obtain material through Court order that he has not sought to obtain through discovery. Based upon the foregoing, Plaintiff's Motions are **DENIED** as premature. (Docs. 17, 40).

## V.     FURTHER PROCEEDINGS IN THIS CASE

This Court has permitted Plaintiff to proceed as to the claims raised in his original Complaint (*see* Doc. 7) and has issued a scheduling order (Doc. 22). That Order is designed to allow for the efficient and orderly resolution of this case. To reiterate, discovery may proceed and shall be completed by January 3, 2019, and any motions pertaining to discovery shall be filed before that date. (*Id.*). Further, depositions of any persons who are incarcerated may proceed on such terms and conditions as the institution shall impose, and any dispositive motion shall be filed by February 4, 2019. (*Id.*). Finally, that case schedule may be modified only upon motion and for good cause shown. (*Id.*) (citing Fed. R. Civ. P. 16(b)(4)).

As this Court recognized at the outset, Plaintiff commenced this action on April 24, 2018, and he has submitted approximately twenty filings in the three months following. The Court finds Plaintiff's filings to be excessive and warns Plaintiff that, if he continues to engage in an excessive filing practice, his conduct could result in sanctions.

## IV.     CONCLUSION

Based upon the foregoing, Plaintiff's Motion for Permanent Injunction and Temporary

Restraining Order (Doc. 13) and Plaintiff's Motion to Amend his Temporary Restraining Order Adding New Constitutional Violation of Irreparable Injury (Doc. 37) are **DENIED**. Plaintiff's Motion for Leave to File "2 Supplemental Complaints" adding new Defendants Mrs. Smith, Mr. Marchand, Mr. Hettinger, and "new events" (Doc. 16) and his related Motions for summons and service (Docs. 20, 39) are **DENIED**. Further, Plaintiff's Motions pertaining to an affidavit of merit and for discovery are **DENIED**. (Docs. 17, 40). Finally, the Court finds Plaintiff's filings to be excessive and warns Plaintiff that, if he continues to engage in an excessive filing practice, his conduct could result in sanctions.

IT IS SO ORDERED.


Date: July 31, 2018                        /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE